# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**GREATBATCH, INC., f/k/a WILSON
GREATBATCH TECHNOLOGIES, INC.,**

      **Plaintiff,**

**-vs-**              **Case No.  6:05-cv-1478-Orl-28DAB**

**ROHWEDDER, INC., MICHAEL E.
MOECKER, BIRGIT WESTPHAL, HERB
NOLD, and ROHWEDDER AG,**

      **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

   This cause came on for consideration with oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANT ROHWEDDER AG'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION (Doc. No. 88)** |
| **FILED:** | **July 12, 2006** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

   This is a diversity action alleging state law claims of breach of contract, fraud, negligent misrepresentation, breach of a fiduciary duty and failure to comply with Chapter 727, Florida Statutes. As alleged in the Second Amended Complaint, Defendant Rohwedder AG (herein "AG") is a foreign corporation, with a principal place of business in Germany (Second Amended Complaint at paragraph 7).  Co-defendant Rohwedder, Inc. (herein "INC"), was a Florida corporation, wholly owned by AG,

albeit indirectly though a holding company.[1]  The Second Amended Complaint alleges that AG "did business in the State of Florida by and through" INC and, upon information and belief, AG was "one and the same" as INC, and AG operated INC as its "alter ego and American arm." *Id.* at Paragraph 15.   In the instant motion, AG seeks dismissal for lack of personal jurisdiction.  The Court has reviewed the record, the exhibits introduced at hearing, as well as the applicable law.  For the following reasons, it is **respectfully recommended** that the motion be **denied.**

### FACTUAL BACKGROUND

Although the Court gave the parties the opportunity to provide evidence at hearing, neither side presented witnesses, and both parties stood on the record presented in the papers, with the exception of nine additional exhibits, introduced by AG (Defendant's exhibits 1-9).  The evidence in the record consists of the exhibits, Affidavit and deposition testimony summarized below.

*The Supplemental Affidavit of Joachim Rohwedder* (Doc. No. 89)--Joachim Rohwedder is Chairman of the Board of AG, a German corporation.  According to this Affidavit, AG has never been licensed or registered to do business in Florida, and has no registered agent or officer for service of process here.  AG "does not do and has never done business in Florida contrary to Greatbatch's allegations in [Paragraphs] 7 and 12 of Plaintiff's Second Amended Complaint."  AG has never profited from business in Florida, never operated an office here, never manufactured, marketed or sold its products here, has no employees or officers in Florida, and no agents or sales representatives here.  AG has never owned real or personal property here and has had no phone or bank account either.  AG "has never conducted any advertising, solicitation, marketing or other sales promotion in Florida."

---

[1]It is acknowledged by all that INC has been administratively dissolved and an assignment for creditors proceeding was instituted pursuant to Chapter 727, Florida Statutes.  INC is no longer doing business.

AG has never paid taxes in Florida and has never filed suit in a Florida court.  Mr. Rohwedder avers that INC was a subsidiary of Rohwedder (USA) Holding, LLC, (herein "LLC") a wholly owned Delaware corporation, incorporated to conduct business in North America.   INC was "not incorporated for the purpose of doing business on Rohwedder AG's behalf" and INC and AG are separate and distinct entities.  Mr. Rohwedder avers that INC was never the agent of AG and always operated independently of AG.   It is averred that AG did not control the day to day activities of INC and AG did not maintain exclusive control and dominion over INC.

Mr. Rohwedder admits that AG made an "emergency loan" to INC to assist INC in making its payroll.

AG did not communicate, discuss, represent or contract with Plaintiff.  AG did not receive any of the payments made by Plaintiff and did not benefit from them.   AG denies that it had any knowledge of Plaintiff's contract with INC prior to the assignment for the benefit of creditors, and denies that it knew that INC had forwarded invoices to Plaintiff for payment prior to that time.

In addition to denying the majority of the allegations of the Second Amended Complaint, Affiant states that to his knowledge, no attorney for AG ever advised Birgit Westphal (INC's former CEO) to "say nothing" to Plaintiff regarding INC's financial condition.  Mr. Rohwedder states that INC was controlled by INC's officers and managers until the assignment for the benefit of creditors on April 12, 2005.

In contrast to the general denials set forth in the Rohwedder Affidavit, Plaintiff offers the testimony via deposition of co-defendant Birgit Westphal.

***Deposition of Birgit Westphal--***Birgit Westphal was President and CEO of INC.  According to her deposition testimony (Westphal Deposition, Doc. No. 91), INC was the "American division"

of Mr. Rohwedder's business (*Id.* at 8, 124-125).  In addition to his role as Chairman of the Board of

AG, Mr. Rohwedder was Chairman of the Board of INC and was the primary decision maker for INC,

intimately involved with the company's operations (*Id.* at 14-15, 22).  On a monthly basis, Westphal

provided Mr. Rohwedder with sales reports and operations reports.  Westphal was also in frequent,

almost daily communication with Mr. Rohwedder regarding sales and operations at INC (*Id.* at 14-15,

21-22).  She  traveled regularly to Germany to attend joint sales meetings with the other Rohwedder

organizations (*Id.* at 19-20).  Westphal routinely advised Mr. Rohwedder of significant contracts that

INC had prepared (*Id.* at 14).  Financial reports were also regularly reported to AG employees. *Id.*

Mr. Rohwedder directed Westphal with respect to hiring and firing employees of INC (*Id.* at 17-8,

30).

   INC held four board meetings a year, which were attended by AG officials (*Id.* at 10-11, 25).

INC held its board meetings jointly with the Canadian subsidiary of AG, Rohwedder Automation

Systems, Inc. ("RAS") (*Id.* at 127).  Mr. Rohwedder traveled to the United States to meet with

customers and potential customers of INC, and for special company occasions (*Id.* at 25-6).

   Officials and employees of AG visited INC's operations in Florida, and AG employees were

brought in by AG to train INC employees (*Id.* at 23-24).  INC also shared employees with RAS (*Id*

at 27-8).  AG  handled all of the marketing for INC (*Id.* at 106).

   Westphal was not involved in the decision to liquidate INC.  That was done solely by AG (*Id.*

at 44-45).  Westphal stated that she was told by Mr. Rohwedder to keep the atmosphere at INC calm

and not to contact any clients or customers until AG's lawyer advised her what to do (*Id.* at 54).

   According to Westphal, AG paid the salary of Westphal and other INC employees for a time

after January 2005, and either Mr. Rohwedder himself, AG, or RAS had previously made INC's

payroll "whenever we didn't have any money" (*Id.* at 64, 71-2, 88).  AG also guaranteed payment of INC's bank loans (*Id.* at 67-8), and AG was a guarantor and, in fact, paid off a 2 million dollar line of credit INC had incurred with a bank located in Florida (*Id.*)

Mr. Rohwedder was advised of the sales prospect with Greatbatch, both verbally and in regular reports (*Id.* at 42, 128).  Westphal believes she also advised AG's counsel regarding the contracts with Plaintiff (*Id.*  at 44).

***The Exhibits--***The exhibits indicate that AG hired a Florida attorney to advise it regarding the liquidation of INC (Doc. 91-4), and possible liability of board members and "principals of AG" (Doc. No. 75-1).  The exhibits also include emails indicating that AG allowed the holding company parent (the LLC) to lapse, and reinstated it shortly prior to the liquidation (R. 75-2).  The exhibits  include an email dated March 24, 2005, from Mr. Rohwedder to the Florida liquidation counsel hired by AG, James Kay, in which he stated the following:

> Bee Westphal received her money this week and the next payment happened by wire transfer from Rohwedder AG on March 23, 2005 to her bank account on time.

> From my prospective [sic] and that you know my frustration in this case Rohwedder Inc. and from my business standpoint I want to give you my personal statement only in short words.  We hired Bee Westphal as a CEO in 2002, we believed in the market, we changed our strategy according with Bee Westphal presentation, we believed in the numbers and in the projections and we pumped a lot of money in this company.  At the end, the financial books of RW Inc. are in a bad condition and we never reached our sales targets.  I think everybody agrees that a company needs orders to survive and the pay the suppliers and the employees.  The last six to seven months we get no order by Rohwedder Inc. and now we stopped the bleeding of this company. When I read the e-mails and when I hear the comments of the management and of the employees, they don't understand our situation and the reasons for closing this company.  For 2005 Rohwedder AG will not have any negative impact through Rohwedder Inc. in there [sic] P + L statements.  This was a board and an advisory board resolution and we informed all our shareholders.

> I take care all the time for Rohwedder Inc. and now it is too much and I have to take care of Rohwedder AG and the other entities.

We have to finalize the Chapter 727 as soon as possible.

(Doc. No. 75-2, at 11,12).

The exhibits AG introduced at hearing include accounting records (indicating that AG received none of the payments made by Greatbatch)  and the contract and invoices with Greatbatch (which are between INC and Greatbatch).

### STANDARDS OF LAW

Where the Court does not conduct an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction,[2] the plaintiff must establish a *prima facie* case of jurisdiction over the defendant by presenting "sufficient evidence to defeat a motion for directed verdict." *Structural Panels v. Texas Aluminum Industries*, 814 F.Supp. 1058, 1063 (M.D. Fla. 1993) *quoting Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir. 1990); see also *Madara v. Hall*, 916 F.2d 1510, 1514 (11th. Cir. 1990).  The Court must accept the facts alleged in plaintiff's complaint as true, to the extent that they are not contradicted by the defendant's affidavits.  *Madara,* 916 F.2d at 1514.  Where there is conflicting evidence, the Court must construe all reasonable inferences in favor of the plaintiff.  *Id.*  Where the parties' affidavits cannot be reconciled, the trial court should hold an evidentiary hearing to resolve the jurisdictional issue.  *Venetian Salami Co. v. Parthenais*, 554 So.2d 499, 503 (Fla. 1989).

Where a defendant is not subject to general jurisdiction in the forum state, a district court may nonetheless exercise specific jurisdiction over a non-consenting defendant if the cause of action

---

[2]As noted recently by Judge Conway, Eleventh Circuit decisions indicate that an evidentiary hearing concerning personal jurisdiction is discretionary.  *Mehlenbacher ex rel. Asconi Corp. v. Jitaru*, 2005 WL 4585859, *11 (M.D. Fla. June 6, 2005) (citing cases).  Here, the Court exercised its discretion and held such a hearing.  The parties added little to the evidentiary record.

'arises out of' or 'relates to' the defendant's in-state activity. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1985). The determination of whether the Court has personal jurisdiction over a non-resident defendant requires a two-part analysis. *See Nida Corp. v. Nida*, 118 F. Supp.2d 1223, 1226-28 (M.D. Fla. 2000) (citing *Venetian Salami Co. v. Parthenais,* 554 So.2d 499, 502 (Fla. 1989)). First, the Court must determine whether there is a basis for jurisdiction under Florida's long-arm statute, Florida Statute § 48.193. *See* FED. R. CIV. P. 4(e)(1), (h), and (k); *Sculptchair, Inc. v. Century Arts, Ltd.,* 94 F.3d 623, 626-27 (11th Cir. 1996). Second, if the Court finds that personal jurisdiction exists under Florida's long-arm statute, the Court must consider whether the defendant's contacts with the state of Florida are sufficient to satisfy the due process clause of the Fourteenth Amendment such that maintenance of the suit in Florida does not offend "traditional notions of fair play and substantial justice." *See International Shoe Co. v. Washington,* 326 U.S. 310, 315-17 (1945); *Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 855 (11th Cir. 1990); *Venetian Salami,* 554 So.2d at 502. If the requirements of both Florida's long-arm statute and the Due Process clause are satisfied, then the Court may exercise personal jurisdiction over the non-resident. *See Madara, supra*, at 1516.

With respect to the particular matter at hand, the Eleventh Circuit summarized the current standards of law, as follows:

> Because the reach of a forum state's long arm statute is a question of state law, we construe it as would the state's highest court [citation omitted]. In Florida, a nonresident is subjected to jurisdiction for "[o]perating, conducting, engaging in, or carrying on a business or business venture ... in this state," "committing a tortious act within this state," or engaging "in substantial and not isolated activity within this state." Fla. Stat. § 48.193(1)(a) and (b), and (2). The necessary minimum contacts between the foreign corporation and the state, for the assertion of general jurisdiction, must be "continuous and systematic." *Consolidated Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1292 (11th Cir. 2000). A corporation which engages in substantial activity

in a state through a subsidiary is subject to personal jurisdiction in Florida. *Universal Caribbean Establishment v. Bard,* 543 So.2d 447, 448 (Fla. Dist. Ct. App.1989). To determine whether a foreign corporation is liable based on a subsidiary's substantial activity, we consider the ownership of the subsidiary, the business activities of the subsidiary, and the financial relationship between the corporation and the subsidiary. *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272-73 (11th Cir. 2002). Because "the mere presence of a wholly owned subsidiary is insufficient to form a basis for the assertion of personal jurisdiction," one of the factors to be considered is the amount of control exercised by the foreign corporation. *State of Florida v. American Tobacco Co.*, 707 So.2d 851, 854-55 (Fla. Dist. Ct. App. 1998). To establish an agency relationship, the foreign corporation must exercise such control that the subsidiary's sole purpose for existence is to accomplish the aims of the foreign corporation and there is no evidence of separate interests. *Id. at 855.* Evidence of operational control is not satisfied where the foreign corporation's policy statements merely establish goals for its subsidiaries and where the subsidiaries operate with a "high degree of autonomy." *Id. at 856.* Jurisdiction over the foreign corporation will not be exercised based on the subsidiary's local activities where the subsidiary carries on its own business and preserves some independence from the foreign corporation. *Consolidated Dev. Corp.*, 216 F.3d at 1293. A foreign corporation will be held subject to personal jurisdiction, however, if the subsidiary is a "mere instrumentality." *Meier*, 288 F.3d at 1273.

*Abramson v. Walt Disney Co.*, 132 Fed. Appx. 273, 275-276 (11th Cir. 2005) (not selected for publication in the Federal Reporter).

### ANALYSIS

**Long Arm Statute**

Plaintiff cites to the following provisions of Florida's long-arm statute:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

(b) Committing a tortious act within this state.

Fla. Stat. § 48.193 (2005). Plaintiff also asserts that general jurisdiction is applicable here, as AG is engaged in "substantial and not isolated activity" within the State through the actions of INC. Fla. Stat. § 48.193(2).

There is no dispute that AG does not own real or personal property or conduct business *in its own name* in the state of Florida. Thus, in order to find AG amenable to long arm jurisdiction under either general jurisdiction or specific jurisdiction, Plaintiff must establish that AG was present in Florida through the admitted presence and substantial activities of INC. In short, Plaintiff must show that INC acted for AG, and is a "mere instrumentality" of AG. Evaluating the factors set forth above, the Court concludes that such a showing has been made.

As quoted above, to determine whether a foreign corporation is liable based on a subsidiary's substantial activity, we consider the ownership of the subsidiary, the business activities of the subsidiary, and the financial relationship between the corporation and the subsidiary. *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272-73 (11th Cir. 2002). *Accord Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino,* 447 F.3d 1357 (11th Cir. 2006).

There is no question that INC was a wholly owned subsidiary of AG, albeit indirectly through the holding company. As for the next two factors, the evidence – viewed favorably to Plaintiff– supports a finding that AG controlled INC, in every sense of the word. Although AG offers conclusory denials that it was not controlling INC, it does not contradict the specific deposition testimony of INC's CEO that all of the Rohwedder entities were treated as divisions of AG, with overlapping directors, employees, marketing and operational systems, joint board meetings and, on occasion, payrolls. It is undisputed that AG paid INC's substantial line of credit (with a bank located in Florida), guaranteed all of its other bank debt, and paid the salaries of INC employees on more than

-9-

one occasion.  INC's CEO reported directly to Mr. Rohwedder, the Chairman of the Board of AG *and*

INC.[3]  Hiring decisions of INC employees were made by Mr. Rohwedder, and AG was intimately

involved with everything from training employees to financial decisions.  Most tellingly, even the

decision to liquidate the company was made solely by AG, with INC employees (including the CEO)

finding out about the decision only after a public announcement had been made on AG's website

(Westphal, at 51-52).  AG consulted a Florida attorney to advise it regarding liquidation, and AG, not

INC, made the decision to liquidate and implemented that decision.

This high level of operational control of the subsidiary distinguishes this case from

*Development Corp. of Palm Beach v. WBC Construction, L.L.C.,* 925 So. 2d 1156 (Fla. 4th DCA

2006), cited by AG.  There, the Fourth District Court of Appeal found that a holding company was

not subject to personal jurisdiction for its interest in a venture in which an operating agreement gave

control of "ordinary and usual decisions" such as hiring and firing, executing leases and contracts,

maintaining bank accounts and such, to a managing member.  Although monthly reports on significant

accounts were made and financial decisions were not completely unchecked, because the holding

company did not control the daily operations of the venture, no jurisdiction was present. *Id.* at 1162.

By contrast, AG had "intimate" involvement with the daily operation of INC.  It directed the hiring,

firing and training of INC employees, handled all of the marketing for INC, guaranteed all debt, paid

payroll when needed, and was involved in all of the "ordinary and usual decisions," including the

ultimate decision of whether to continue operating.  Although AG contends that it observed all

corporate formalities and did not exert control over INC "to such an extent that INC 'functioned

---

[3]The Court notes that Mr. Rohwedder did not mention his position with INC in his Supplemental Affidavit.  The Court also observes that Mr. Rohwedder made no effort to claim that his actions were taken solely in his capacity as Chairman of the Board of INC. As such, the only evidence in the record on this point is that AG treated INC as a division of AG, and Mr. Rohwedder, in his capacity as Chairman of AG, was ultimate decision maker for all divisions.

solely to achieve the purposes of' AG" (Doc. No. 88 at 17, *quoting American Tobacco,* 707 So. 2d at 856), this contention is belied by the explanation offered by Mr. Rohwedder to AG's lawyer: "The last six to seven months we get no order by Rohwedder Inc. and now we stopped the bleeding of this company. * * * For 2005 Rohwedder AG will not have any negative impact through Rohwedder Inc. in there [sic] P + L statements."  While a parent has a legitimate interest in the profitability of its subsidiaries, when, as here, the subsidiary has no genuinely separate existence it functions solely to achieve the purposes of the parent.  Indeed, when it fails to achieve those purposes it may find itself, as INC did, no longer functioning at all.  Mr. Rohwedder himself bemoaned; "I take care all the time for Rohwedder Inc. and now it is too much and I have to take care of Rohwedder AG and the other entities."

The Court does not overlook that there is evidence that indicates, especially toward the end of INC's existence, that AG was not alone in using INC for its own purposes.  Certain INC employees, notably Westphal, were acting in ways to further their own independent purposes, and not necessarily to further corporate purposes.  In her deposition, for example, Westphal details her offer, along with other executives, to purchase INC from AG.  Westphal established another company, Sixth Sense Automation, Inc., and the exhibits indicate that certain of the payments made by Plaintiff went to that company.   The Second Amended Complaint alleges that the Assignee in the Chapter 727 proceedings moved to sell the assets of INC to Sixth Sense Automation for a total purchase price of $100,000.00, albeit unsuccessfully, as AG objected (Second Amended Complaint at paragraph 47).  There is a difference, however, between controlling a company and controlling every action of the executives of the company.  Here, the evidence shows that AG had predominate operational control over INC  – in life and in death – to such a degree that INC existed solely to serve AG's purposes.

The Court finds that AG engaged in activities in this state through the substantial activities of its subsidiary, INC, and has therefore satisfied the first prong of the jurisdictional analysis.

**Due Process**

Having determined a basis for jurisdiction under Florida's long arm statute, the Court proceeds to an analysis of due process considerations.   The due process analysis is a two-prong inquiry. First, the Court determines whether sufficient minimum contacts exist between the defendant and the forum state to satisfy the Due Process Clause of the Fourteenth Amendment. *Robinson v. Giarmarco & Bill, P.C.,* 74 F.3d 253, 258-60 (11th Cir. 1996); *Madara,* 916 F.2d at 1510.  Second, the Court determines whether the maintenance of the suit is reasonable, and does not violate "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316.

In determining whether sufficient minimum contacts exist with the state of Florida, the Court considers whether the defendant has purposefully established minimum contacts with the forum state out of which the instant action arises. *See Hoechst Celanese Corp. v. Nylon Engineering Resins, Inc.,* 896 F.Supp. 1190, 1193 (M.D. Fla. 1995) (citing *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cty.,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). The Court assesses whether the defendant has purposefully availed itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protection of its laws.  *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985).

The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person. *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299 (1980); *Helicopteros Nacionales de Colombia, S.A.*

*v. Hall,* 466 U.S. 408, 417 (1984).  Adequate contacts proximately result from a defendant's actions which create a "substantial connection" with the forum State. *Burger King,* 471 U.S. at 475. The substantial connection between a defendant and the forum state must come about by an action of the defendant purposefully directed toward the forum state. *See Asahi,* 480 U.S. at 109-11.

In the second prong of the due process analysis, the Court determines whether the maintenance of the suit is reasonable and does not violate "traditional notions of fair play and substantial justice." *International Shoe,* 326 U.S. at 316.  The Court considers the defendant's contacts with the forum state in light of several factors, including: 1) the burden on the defendant in defending the lawsuit in the forum state; 2) the forum state's interest in adjudicating the dispute; 3) plaintiff's interest in obtaining convenient and effective relief; 4) the interstate judicial system's interest in obtaining most efficient resolution of the controversy; and 5) the shared interests of the several states in furthering fundamental substantive social policies. *See Asahi,* 480 U.S. at 113, 107 S.Ct. 1026; *Madara,* 916 F.2d at 1517.

Applied here, the Court finds that AG purposely availed itself of the privilege of conducting activities in the state of Florida.  INC was the American division of AG and AG was intimately involved in its day to day operations.  As set forth above, AG was involved in a variety of activities in Florida, including sending its employees into the state to train INC employees, hiring a Florida lawyer to advise it as to a suit it subsequently directed be filed in Florida,[4] and guaranteeing and paying off a line of credit with a Florida bank.[5]  These connections are not random or fortuitous and establish that AG is clearly no stranger to the state.  Sufficient minimum contacts are present.

---

[4]Although AG did not file the suit to dissolve INC in its own name, the evidence establishes that the decision to liquidate INC via the Chapter 727 proceeding was made by AG.

[5]Note that these are the actions of AG itself, and not AG acting through its division, INC.

-13-

As for the second prong, the Court concludes that maintenance of the suit in Florida is reasonable and fair.  There is no evidence that litigating this dispute in Florida, where the alleged torts arose, is a burden on AG.  Indeed, the record reflects that Mr. Rohwedder was a frequent traveler to the state.  Florida has a clear interest in the litigation, as all other defendants are (or were) residents, and the cause of action derives from state law.  Indeed, it is doubtful that suit could be brought against all defendants anywhere else, thus supporting Plaintiff interest in obtaining complete relief and the judicial system's interest in resolving the dispute in the most efficient way.  Absent any evidence other than Mr. Rohwedder's conclusory averment that AG did not have any expectation that it would be haled into court as a defendant in Florida, the Court finds no due process impediment to this Florida action, with respect to AG.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Court finds that personal jurisdiction has been established over AG, and therefore it is **respectfully recommended** that the motion be **DENIED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on October 6, 2006.

*David A. Baker*
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy